**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| v. | ) | **C.A. NO. 04-10319-WGY** |
| | ) | |
| **NOEL HERNANDEZ** | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**
**IN-COURT AND OUT-OF-COURT IDENTIFICATIONS**

**INTRODUCTION**

Claiming that the out-of-court photographic identification of the defendant was overly suggestive and "patently unreliable," the defendant, Noel Hernandez (Hernandez), has moved to suppress his out-of-court identification as well as any subsequent in-court identification.  Because the identification itself was reliable under the totality of circumstances, the defendant's motion must be denied.

**STATEMENT OF THE CASE**[1]

On October 14, 2004, a grand jury returned a three-count indictment against Hernandez, charging him with conspiracy to import more than 100 grams of heroin in violation of 21 U.S.C. § 963, illegal importation of 100 grams or more of heroin in

---

[1]Entries in the defendant's and codefendants' dockets are cited as (DE [number of entry] or [date of entry]).  Citations to the defendant's motion and memorandum in support of his motion to suppress are, respectively (DMO and DBR [page]).

1

violation of 21 U.S.C. § 952(a), and aiding and abetting the
above-cited offenses in violation of 18 U.S.C. § 2.[2] (DE 21). He
was arraigned before Magistrate Judge Marianne B. Bowler on
October 27, 2004.  (DE 10/27/04).   On January 25, 2005, pursuant
to plea agreements with the government, Hernandez's codefendants,
Francisco Navarro (Navarro) and Caesar Mercedes (Mercedes),
pleaded guilty to various charges stemming from their involvement
with the defendant in this heroin importation conspiracy. (DE
28).   The Court set June 2, 2005, for sentencing of Navarro and
Mercedes. (DE 30).

Claiming "[r]ecent discovery provided by the government on
February 14, 2005, ha[d] alerted undersigned counsel to an issue
relating to the identification of the Defendant by his
codefendants," (DMO 1), Hernandez filed a Motion for Leave to
File a Motion to Suppress In-Court and Out-of-Court
Identifications Late as well as a substantive Motion to Suppress
on March 2, 2005.[3]  (DE 39).  The next day this Court granted the

_____

[2]Hernandez had been previously charged by means of a
Criminal Complaint, dated July 14, 2004, with conspiracy to
unlawfully import heroin into the United States.  The affidavit
of Special Agent Christopher Diorio of the Bureau of Immigrations
and Customs Enforcement (ICE) is attached hereto and incorporated
herein for all purposes as Exhibit 1.  Citations to the docket
entries are

[3]Contrary to the suggestion that the government recently
sprung information on the defense regarding an identification
procedure, the affidavit filed in support of a criminal complaint
against Hernandez and his co-defendants clearly sets forth the
identification procedure at issue in the present case.  See (DE 2

defendant's Motion to File a Motion to Suppress In-Court and Out-of-Court Identifications Late, (DE 03/03/05), and set the hearing date on the substantive motion to Suppress for April 27, 2005. (DE 03/07/05).

STATEMENT OF THE FACTS

A precis of the facts set forth below is culled from the affidavit of Special Agent Christopher Diorio of the Bureau of Immigrations and Customs Enforcement (ICE), which was submitted in support of the issuance of a Criminal Complaint in this matter.  It is not intended to be a comprehensive statement of the evidence.[4]  The government also intersperses throughout this memorandum facts that it anticipates will be adduced during the evidentiary hearing on this matter.

---

and affidavit attached as Exhibit 1).  Specifically, paragraph numbered 13 of the complaint affidavit states,

> Also in the course of our exchange with HERNANDEZ, he told agents that he was a former Delta Airlines employee working here in Boston.  He then produced a color photograph of himself and another employee standing on the Logan Airport tarmac in front of a Delta Airlines jet and handed same to agents.  This photograph was later placed in front NAVARRO who voluntarily pointed to HERNANDEZ and stated "that's Noel."

The prosecution clearly and succinctly alerted Hernandez to the identification procedure very early in the proceedings – certainly well in advance of the requirements of Local Rules 116.1(C)(1)(f) and 116.2(A)(2).

[4]The government reserves the right to supplement the record and/or its Opposition after witnesses have testified at the evidentiary hearing on the defendant's pretrial Motion to Suppress Identification (presently scheduled for April 27, 2005).

**FRANCISCO NAVARRO AND CAESAR MERCEDES**

On July 13, 2004, American Airlines Flight No. 2084 arrived from Santo Domingo, Dominican Republic at Logan International Airport in Boston at approximately 10:00 P.M.  Mercedes and Navarro, traveling under Dominican passports, were passengers on that flight and exited the plane together along with the other passengers at Terminal E.

During the Customs and Border Protection (CBP) examination process carried out routinely by CBP Inspectors of the Flight No. 2084's passengers, Mercedes and Navarro were selected by CBP Inspectors for examination and questioned briefly by two different CBP Inspectors.[5]  During their interviews (conducted separately), Inspectors asked Mercedes and Navarro a series of questions.  When asked if they had been traveling with anyone else, both Mercedes and Navarro replied that they were traveling alone and that they did not know each other.  Also, when asked the purpose of their visit to the states, Mercedes replied that he was here to do "tile" work for $75 a day; Navarro replied that

---

[5]  Mercedes and Navarro had been previously identified by CBP Passenger Analysis Unit from the AA Flight 2084 manifest because their airline tickets to Boston had been purchased by a third party from a travel agency in Lynn, MA using cash the same day as Mercedes' and Navarro's initial departure from Puerto Rico.  After spending 3 days in Santo Domingo, Mercedes and Navarro then departed the D.R. on route to Boston on July 13, 2004.  Likewise, neither Mercedes or Navarro had return tickets to either Santo Domingo or Puerto Rico.  Such unusual travel arrangements was consistent, based on Special Agent Diorio's experience, with possible drug smuggling activity.

4

he had come to see a friend in Massachusetts for a couple of days and then intended to travel to New York City.

After some additional questions, both Mercedes and Navarro were asked (separately) if either man had swallowed illegal drugs before entering the United States that night. Mercedes admitted to CBP Inspectors that he, in fact, had swallowed 40 pellets of "cocaine." Navarro was asked the same question and replied that he, too, was in possession of drugs but that they were hidden in his groin area. However, after being warned by Inspectors that his health might be in jeopardy if he had drugs internally, he then admitted to also swallowing pellets containing drugs. A search of Navarro's groin area revealed 11 egg shaped pellets containing a white powder that later tested positive for heroin.

Based on the above information and the discovery of heroin on Navarro's person, both Mercedes and Navarro were quickly taken to Whidden Memorial Hospital in Everett, MA so that they could naturally "pass" whatever pellets containing illegal drugs both men admitted to consuming earlier. Over the next several hours, both Mercedes and Navarro passed multiple egg-shaped pellets containing a white powder. The net weight of the heroin swallowed by Mercedes came to 384 grams. The net weight of the heroin transported by Navarro came to 490 grams (for a total drug weight of 874 grams).

**NOEL HERNANDEZ**

Prior to Mercedes and Navarro departing for the Whidden Hospital and their need to "pass" heroin pellets, Special Agent Diorio asked Navarro who was planning to pick him up at Logan Airport following his arrival that night. Navarro said that he was to be picked up by "Noel Hernandez" and gave Diorio a physical description of this individual – an Hispanic male, approximately 5" 1" tall, with a dark complection. Navarro also supplied me with a cellular telephone number with which to contact Noel Hernandez directly: 857-472-3142.[6]

Armed with this information, Special Agent Diorio proceeded to the Terminal E floor in the hope of locating Hernandez. On arriving at the Terminal E floor, Special Agent Diorio called the cellular number Navarro had just given to him and heard the phone ring several times. A male voice answered the phone and said "hello" in an Hispanic accent. Diorio then asked if he was speaking with "Noel?" The male voice replied, "yes." Diorio then asked "Noel" several questions including whether he (Hernandez) was at the airport. "Noel" said that he was at the airport but at "Terminal B." (Terminal B is the AA terminal for domestic flights; Terminal E is for all International arrivals, including AA flights). When "Noel" asked who Diorio was, Diorio replied that he was "with his friend." After clearing up the

---

[6] This number is the contact telephone number that appeared with the reservation information for the Mercedes and Navarro airline tickets.

6

confusion about which Terminal Diorio was at, "Noel" told Diorio
not to go anywhere and that he would be right there.  Diorio then
walked outside to the curb at Terminal E and waited approximately
5 minutes.  At that point, Diorio observed an Hispanic male
fitting the physical description previously given by Navarro,
drive slowly by Diorio in a white station wagon looking around as
if trying to find someone.  At that moment, Diorio called the
same cellular number over which he had just spoken with "Noel"
(857 472-3142) and observed the same Hispanic male driving the
white station wagon put the phone to his ear, answer his phone
and begin to speak to him.

After talking with "Noel" over his telephone a few more
moments, Diorio and other agents approached "Noel's" vehicle
and spoke with him further.  Hernandez was asked for
identification and he produced both a Massachusetts Driver's
License and a Permanent Legal Resident Alien card both in the
name Noel Hernandez. Hernandez was asked what he was doing at the
airport.  Hernandez replied that he was there to pick up an adult
(a person he identified as "Luis") and two children.  Hernandez
also said that he did not know who these people were, but that he
expected to be contacted by telephone about where to pick them
up.  Hernandez also said that his instructions were to take these
three passengers to Maverick Square in East Boston and drop them
off in the square. Hernandez also said they would then be picked

7

up by a man named "Medina."

During this interview of Hernandez, he agreed to permit Diorio to inspect the contents of his wallet.  During his inspection of the wallet, Diorio discovered a small amount of white powder wrapped up/concealed in a dollar bill.  The powder appeared to Diorio to be a controlled substance and, later, was determined to be cocaine.

Following discovery of the drugs, Hernandez was arrested by State Troopers and his person was searched incident to his arrest.  During this search, a white business size envelope from "Union Travel" in Lynn, Massachusetts, was discovered in one of Hernandez' pockets.  The envelope contained the American Airlines travel itinerary for both Mercedes and Navarro on AA Flight No. 2084, as well as a cash invoice (dated July 10, 2004) from Union Travel confirming payment of Mercedes' and Navarro's one-way airline tickets departing Puerto Rico on July 10, 2004, stopping in the Dominican Republic, and ending up in Boston, MA on July 13, 2004.

Also in the course of the exchange with Hernandez, he told agents that he was a former Delta Airlines employee working here in Boston.  He then produced a color photograph of himself and another employee standing on the Logan Airport tarmac in front of a Delta Airlines jet and handed same to agents.  This photograph was later placed in front Navarro who voluntarily pointed to

8

Hernandez and stated "that's Noel."

**ARGUMENT**

A defendant who challenges identification procedures has the burden to show by a preponderance of the evidence that they violated his constitutional rights. <u>United States v. Wade</u>, 388 U.S. 218 (1967). The First Circuit requires the use of a two-pronged test for analyzing whether evidence of a pretrial identification should be suppressed. A trial judge must first determine whether the procedure was impermissibly suggestive. <u>United States v. Lopez-Lopez</u>, 282 F.3d 1, 10-11 (1st Cir. 2002). If they were not, then "the court need proceed no further in its inquiry." <u>United States v. McGuire</u>, 918 F.2d 254, 263 (1st Cir. 1990). However, if the defendant proves that the procedures were suggestive, the court then "must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." <u>Lopez-Lopez</u>, 282 F.3d at 10-11.

Reliability is "the linchpin in determining the admissibility of identification testimony." <u>Manson v. Brathwaite</u>, 432 U.S. 98, 113-14 (1977). Reliability is determined by five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty

demonstrated by the witness at the confrontation; and, (5) the length of time between the crime and the confrontation. <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972). "Before excluding identification evidence, the court must be persuaded that there was 'a very substantial likelihood of irreparable misidentification.'" <u>United States v. de Jesus-Rios</u>, 990 F.2d 672, 677 (1st Cir. 1993) (quoting <u>United States v. Bouthot</u>, 878 F.2d 1506, 1514 (1st Cir. 1989)). <u>See also</u> <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)("we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). <u>Accord</u>, <u>United States v. Maguire</u>, 918 F.2d 254 (1st Cir. 1990)(affirming that photo array becomes impermissible only if it "induces a very substantial likelihood of irreparable misidentification"); <u>United States v. Turner</u>,892 F.2d 11, 14 (1st Cir. 1989) ("it is only in extraordinary cases that identification evidence should be withheld from the jury").

Hernandez's motion must be denied because he cannot satisfy the second prong of the suppression test, that is, that the identification itself was unreliable. <u>Lopez-Lopez</u>, 282 F.3d at

10-11.  As set forth above, the only identification procedure
used in this case involved a photograph taken from the defendant
and shown to Navarro shortly after their arrests and just prior
to Nararro's transport to a hospital.[7]  While the placement of a
single photograph before an alleged coconspirator is arguably an
impermissibly suggestive procedure, the identification itself
nevertheless is entirely reliable in the totality of
circumstances and therefore the out-of-court identification, as
well as any subsequent in-court identification, should be
admitted at trial.

     Here, shortly after his arrest, Navarro informed ICE agents
that he was to be picked up by "Noel Hernandez."  He provided
Special Agent Diorio with a physical description of Hernandez [an
Hispanic male, approximately 5" 1" tall, with a dark complection]
that later proved correct.  Navarro even gave agents Hernandez's
telephone number.  He provided this information prior to being
transported to the hospital to "pass" the pellets containing the
heroin.

     Special Agent Diorio took immediate steps to corroborate
Navarro's information.  He called Hernandez at the number
provided by Navarro and spoke to "Noel."  He arranged to meet

---

     [7]The defendant's suggestion that Mercedes likely was given
an opportunity to view the photograph of Hernandez is entirely
unwarranted speculation.  (DBR 3).  Special Agent Diorio makes no
such statement in either his affidavit for the issuance of the
Criminal Complaint or his report.

with "Noel" at an airport terminal and subsequently verified Hernandez's physical description.  Diorio further visually confirmed Hernandez using the telephone assigned the number that Navarro had just provided to agents.  Upon stopping Hernandez, agents verified his identity through a Massachusetts Driver's License and a Permanent Legal Resident Alien Card in Hernandez's possession.  Notably, Hernandez was found in possession of cash receipts from a travel agency confirming payment of Mercedes' and Navarro's one-way airline tickets as well as both Navarro's and Mercedes' flight itineraries for their trips departing from Puerto Rico, stopping in the Dominican Republic, and arriving in Boston.  He volunteered the photograph of himself and another individual, informing agents that he was a Delta Airlines employee.

Showing Navarro a single photograph of Hernandez before Navarro was transported to the hospital to "pass" a substantial amount of heroin, although arguably suggestive, is nevertheless inherently reliable particularly given the degree of corroboration present in this case.  The defendant's suggestion that, "the witnesses in this case have been offered plea agreements in exchange for their testimony, giving them added incentive to positively identify the only individual shown to them," (DBR 4), is misguided at best.  A plea agreement requiring Navarro to testify was not executed in this case until well after

12

his arrest and arraignment on the present indictment.  Indeed, this Court could find that Navarro's identification shortly after his arrest carries with it a greater degree of reliability given the very legitimate fear of providing misinformation to law enforcement after agreeing to cooperate in the investigation.

Moreover, it is anticipated that the government will elicit testimony at the suppression hearing to show that Hernandez was no stranger to Navarro.  The two men have known each other for several years.  Navarro is very familiar with Hernandez's physical appearance (and in fact provided an accurate description to the agents), and unequivocally identified "Noel" from the photograph.  Hernandez, the evidence will show, had developed a relationship with Navarro to the extent that he lent Navarro a substantial amount of money in the past.  He obviously trusted Navarro to such a degree that he permitted him (and Mercedes) to transport nearly a kilogram of heroin.

There is simply no legitimate basis to suppress the out-of-court, let alone the in-court, identification.  Compare United States v. Bouthot, 878 F.2d 1506 (1st Cir. 1989) (identification unreliable where defendant merely drove by robbery, was not paying attention, and had only 30 seconds to observe).  Even assuming arguendo that the out-of-court identification was somehow irreparably tainted, Navarro may still make an in-court identification of Hernandez if this Court finds by clear and

convincing evidence that the in-court identification was based on an independent basis free of the original taint.  See Wade, 388 U.S. at 240; see also United States v. Fitzpatrick, 434 F.2d 187, 188 (1st Cir. 1970).  On the state of the evidence before this Court, there clearly exists an independent basis for permitting Navarro's in-court identification of Hernandez at trial.

The Supreme Court has noted that, absent extraordinary circumstances indicating its unreliability, the weighing of identification evidence is primarily the province of the jury. "We are content to rely upon the good sense and judgment of American juries . . . .  Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."  Manson, 432 U.S. at 116, quoted in Maquire, 918 F.2d at 264.  If there were any questionable aspects of the witnesses' identifications of Hernandez here, that is an issue which the jury is fully capable of weighing in evaluating the weight to be given that identification.

## CONCLUSION

For the above-enunciated reason, the government respectfully urges this Court to deny the defendant's Motion to Suppress In-Court and Out-of-Court Identifications.

Respectfully submitted,

14

```
                         MICHAEL J. SULLIVAN
                         United States Attorney


                    By:  /s/William F. Bloomer
                         WILLIAM F. BLOOMER
                         Assistant U.S. Attorney
```